UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

RICHARD L. WALTRIP,

      Plaintiff,                             Civil Action No. 14-10886

v.                                   HON.  DENISE PAGE HOOD
                                      U.S. District Judge
                                      HON. R.  STEVEN WHALEN
COMMISSIONER OF SOCIAL         U.S. Magistrate Judge
SECURITY,

      Defendant.
_____/

## REPORT AND RECOMMENDATION

Plaintiff Richard L. Waltrip ("Plaintiff") brings this action under 42 U.S.C. §405(g) challenging a final  decision of Defendant Commissioner denying his  application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act.  Both parties have filed summary judgment motions which have been referred for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).  For the reasons set forth below, I recommend  that Defendant's Motion for Summary Judgment be DENIED and that Plaintiff's Motion for Summary Judgment GRANTED, remanding this case for an award of benefits for the period between June 3, 2008 and July 31, 2009 and remanding for further fact-finding and determination of whether Plaintiff is entitled to benefits from August 1, 2009 and forward.

-1-

## PROCEDURAL HISTORY

On April 5, 2011, Plaintiff applied for DIB, alleging an onset of disability date of June 3, 2008 (Tr. 147-150).   After the initial denial of benefits, Plaintiff requested an administrative hearing, held on July 12, 2012 in Flint, Michigan before Administrative Law Judge ("ALJ") Kevin W. Fallis.   Plaintiff,  represented by attorney John Morosi, testified (Tr. 40-73) as did Vocational Expert ("VE") Stephanie Leach (Tr. 74-83).  On September 28, 2012,  ALJ Fallis found Plaintiff not disabled  (Tr. 29).  On December 30, 2013, the Appeals Council denied review (Tr. 1-3).  Plaintiff filed for judicial review of the final decision on February 26, 2014.

## BACKGROUND FACTS

Plaintiff, born December 19, 1966, was 45 when the ALJ issued his decision (Tr. 29, 147).  He graduated from high school and worked previously as a sales associate, carpenter, cook, restaurant manager, and truck driver (Tr. 166).  He alleges disability as a result of a motorcycle accident resulting in a broken pelvis, an aneurysm, two strokes, and nerve damage to his left leg (Tr. 165).

### A.    Plaintiff's Testimony

Plaintiff offered the following testimony:

He became disabled on June 3, 2008 upon sustaining serious injuries when his motorcycle was "sucked under" a semi-truck (Tr. 40-41).  He experienced memory problems

for two weeks after the accident (Tr. 41).  He experienced "flashbacks" of the accident and had considered obtaining mental health treatment (Tr. 42).  He spent six months after the accident "flat on [his] back" (Tr. 42).  Due to the injury to the left leg, he experienced edema, numbness, and "severe cramping" (Tr. 42).  His ability to walk was limited to walking "out to the mailbox and back" (Tr. 43).  His left leg was now a couple of inches shorter than the right (Tr. 43).  He experienced "constant" left hip pain (Tr. 43).  A titanium rod had been inserted into his left thigh and hardware had been inserted into his hip at the site of the fracture (Tr. 43).  The left leg required constant elevation (Tr. 43).  The left leg edema (due to a damaged blood vessel) was charactered by "weeping" of a clear or yellowish fluid and calf pain (Tr. 44).  His physician had prescribed a cane but he used it as little as possible because he feared becoming "dependent on it" (Tr. 45).  He spent long stretches of his waking hours on his back due to the edema and fatigue (Tr. 46).  He currently took Norco for pain; blood pressure medication to avoid an aneurysm recurrence; and Lasix and potassium for the leg swelling  (Tr. 46).  He experienced lower back pain when sitting and leg pain while standing (Tr. 47).

He spent large portions of his day sitting on the porch, throwing a ball to the dog, and talking to his friends on the telephone (Tr. 47).  He lived with his wife and 18-year-old daughter (Tr. 47).  His pain medication caused sleep disturbances and daytime drowsiness (Tr. 48).  He experienced an aneurysm one year after his accident (Tr. 48).  Following the implantation of a stent, he sustained a stroke creating left-sided numbness (Tr. 49).  He

experienced balance problems walking on uneven surfaces (Tr. 50). Damage to his hamstring muscles from the accident were exacerbated by the stroke (Tr. 51). The stroke also affected the vision in his right eye, creating light sensitivity and headaches (Tr. 51). He tried to limit his pain medication use due to his fear of becoming "a junkie" (Tr. 52). His jobs as both a truck driver and cook required him to lift up to 100 pounds (Tr. 52-53). Before his motorcycle accident, he would typically work more than 60 hours a week (Tr. 54).

In response to questioning by his attorney, Plaintiff stated that he used stairs only twice a day, once to descend from his bedroom in the morning and once when retiring at night (Tr. 55). He experienced difficulty climbing stairs (Tr. 55). He was 230 pounds before the accident but now weighed 203 (Tr. 56). He denied receiving either unemployment insurance or Workers' Compensation benefits (Tr. 57). He was unable to lift more than 10 pounds and was wholly unable to stoop (Tr. 57). He was unable to walk for more than 10 minutes (Tr. 58). His ability to perform fine manipulative activities with his left hand was limited by the stroke (Tr. 59). He also experienced right-side problems due to the onset of arthritis after the accident (Tr. 59). He was able to put hamburgers on the grill but was unable to perform laundry chores or grocery shop (Tr. 59-60). He was able to use a broom occasionally and could take out a small bag of garbage to the curb (Tr. 60). He rarely used a computer (Tr. 61). His socializing was limited to going out to dinner with his wife or going to a friend's house (Tr. 62). He hunted once in the past year, noting that he relied on his friends to "walk" him, with breaks, to and from the blind site (Tr. 63). He was unable to fish

-4-

due to his inability to sit down or arise from a sitting position on a rocking boat (Tr. 64). He did not smoke and drank on an occasional basis (Tr. 64).

**B.   Medical Evidence**

On June 3, 2008, Plaintiff was hospitalized after sustaining injuries in a motorcycle accident (Tr. 266). Imaging studies showed left femur and hip fractures (Tr. 228, 249). He underwent surgery for a fractured femur with hardware placement and "excision and debridement" of skin, subcutaneous tissue, fat, and connective tissue traumatized in the accident (Tr. 230, 262). The following month, Plaintiff was advised to refrain from performing any weight-bearing activities (Tr. 227). July 17, 2008 treating records note that Plaintiff was still wheelchair bound (Tr. 226). An MRI of the cervical spine showed mild neural foraminal narrowing at C5-C6 and C6-C7 resulting from degenerative changes (Tr. 315).

October, 2008 physical therapy notes state that Plaintiff had "graduated" to crutch use (Tr. 506). December, 2008 therapy notes state that after 23 visits, Plaintiff continued to "slowly improve" (Tr. 514). Plaintiff reported "seepage of fluids in the left calf" and level "3-8" pain on a scale of 1 to 10 (Tr. 514). In February, 2009, Plaintiff reported "2-6" level pain (Tr. 517). Therapy notes state that he could walk with a cane but had a "large wound" on the "left hamstrings" (Tr. 517). The following month, Plaintiff reported "2-5" level pain after 39 physical therapy sessions (Tr. 520). He was assessed with a 60 percent improvement in activities of daily living (Tr. 520). The goal of "mobility and normal gait pattern" was

deemed "partially met" (Tr. 520).   The following month, therapy notes state that Plaintiff had "been ambulating for greater distances" (Tr. 525).   In May, 2009, Plaintiff was discharged after 55 sessions for failure to attend additional sessions (Tr. 529).   Four days later, Plaintiff was diagnosed with a "giant aneurysm" of the distal right internal carotid artery after exhibiting slurred speech, headaches, and light sensitivity (Tr. 324).   The artery was catheterized  (Tr. 321-322).  A stent was implanted in the carotid artery the following month (Tr. 397-398).  Plaintiff reported right eye light sensitivity and headaches following surgery (Tr. 388).  A followup MRI of the brain showed abnormalities creating "mild mass effect on the right optic nerve and optic chasm" (Tr. 319).   The following month, Plaintiff sought treatment after experiencing weakness on the left side (Tr. 385).   He was diagnosed with a stroke (Tr.  385, 415). Physical therapy notes from the following month state that Plaintiff reported level "5" pain (Tr. 530, 532).   September, 2009 therapy notes state that the left leg wound had recently reopened (Tr. 533).   His activities of daily living were assessed at 70 percent functionality (Tr. 533). The therapy notes indicate that he continued to experience an abnormal gait (Tr. 533).   Therapy notes from October, 2009 state that Plaintiff required the continued use of pain medication (Tr. 535-536).   He reported increased knee pain (Tr. 536).

A December, 2009 MRI of the brain was unremarkable (Tr. 394).  The same month, Plaintiff reported that he was "about 90% back to his baseline" but still experienced manipulative problems with the left fingers (Tr. 385).  January, 2010 therapy records state

that Plaintiff continued to experience "numbness, weakness, and stiffness in the left hip, knee and ankle" (Tr. 543). His ability to perform activities of daily living regressed to 60 percent (Tr. 543). The following month, he reported level "3" pain (Tr. 546). Therapy records note continued gait "deviations" (Tr. 546). May, 2010 treating records show that Plaintiff experienced chronic pain and insomnia (Tr. 430).

June, 2011 notes by Douglas Benton, D.O. state that Plaintiff experienced left knee problems, left arm weakness, and facial numbness (Tr. 469). July, 2011 treating records by Dr. Benton state that Plaintiff reported occasional alcohol use but denied drug use (Tr. 464). A physical examination was unremarkable (Tr. 464). Dr. Benton's November, 2011 records note the conditions of "traumatic arthritis" of the left hip and left knee (Tr. 473). Dr. Benton's March, 2012 records state that Plaintiff reported "sudden onset of constant episodes of moderate left hip pain" (Tr. 476). The following month, Plaintiff sought treatment after breaking his left ankle (Tr. 478, 486).

In July, 2012, Dr. Benton completed an assessment of Plaintiff's functional abilities, noting the presence of chronic hip, knee, and thigh pain accompanied by thigh muscle atrophy (Tr. 497). Dr. Benton found a "significantly reduced" range of motion along with sensory loss, reflex changes, muscle atrophy, and muscle weakness (Tr. 498). He found that pain and drowsiness caused by pain medication would interfere with Plaintiff's work duties on a constant basis (Tr. 498). He found that Plaintiff was limited to walking one city block (Tr. 498). He found that Plaintiff was limited to sitting for four hours in an eight-hour period

and standing or walking for two (Tr. 499). He found that Plaintiff was limited to lifting 10 pounds on an occasional basis (Tr. 500). He found that Plaintiff's limitations would cause absences from work more than three times a month (Tr. 500). The same month, Dr. Benton issued an opinion letter on Plaintiff's behalf, stating that Plaintiff experienced "permanent nerve damage, muscle atrophy, weakness, pain and edema of his left leg" (Tr. 502). He noted that the edema was "+2 pitting . . . edema" and "ha[d] been weeping occasionally" (Tr. 502). He noted that Plaintiff was taking Lasix once daily for the condition (Tr. 502, 503-504). The same month, an MRI of the cervical spine showed moderate narrowing of the left neural foramen at C5-C6 and C6-C7 with evidence of degenerative joint disease "slightly progressed from a September, 2008 study (Tr. 586-587). The same month, an EMG of the right upper extremity was "abnormal," with "[s]everal different problems" including Carpal Tunnel Syndrome and mild abnormalities of the ulnar nerve (Tr. 589-590).

### C.   Vocational Expert Testimony

VE Stephanie Leech characterized Plaintiff's former work as a carpenter as skilled at the medium exertional level (very heavy as performed); cook/restaurant manager, skilled/light (heavy as performed); and truck driver semiskilled/medium (heavy as performed) (Tr. 76). Describing a hypothetical individual of Plaintiff's age, education, and work background, the ALJ posed the following question to the VE:

> This individual would be able to perform work at the light level, which is lift up to 20 pounds occasionally, lift/carry up to ten pounds frequently. However, they'd only be able to stand/walk for about two hours and sit for up to six hours in an eight-hour workday with normal breaks. They could perform

occasional pushing or pulling. They could never operate a foot control with
the left lower extremity. They could never climb ladders, ropes, or scaffolds.
They could occasionally climb ramps or stairs, occasionally balance, stoop,
kneel, crouch and crawl. They would be limited to occasional handling of
objects and fingering with the left upper extremity. Per claimant's testimony,
he is ambidextrous and he said predominately right-handed, though. So, this
would be the non-dominant upper extremity. They would have to avoid all
exposure to extreme cold. They would have to avoid all exposure to excessive
vibrations, all use of hazardous moving machinery and all exposure to
unprotected heights (Tr. 77-78).

The VE testified that while the above described individual would be unable to perform

Plaintiff's past relevant work, he could perform the light, unskilled jobs of office clerk (2,000)

positions in the regional economy); food preparer (1,500); and inspector (2,000) (Tr. 78-79).

The VE testified that if the same individual also required the use of a cane for "uneven

terrain or prolonged ambulation," the job numbers would be reduced to office clerk (1,000);

food preparer (750); and inspector (1,000) (Tr. 79). If the same individual were allowed to

perform his job in either a sit or stand position, the numbers would be reduced to office clerk

(750), food preparer (500); and inspector (750) (Tr. 80).

The VE testified that if the originally described individual (see block quote, above)

were limited to sedentary rather than light work, he could perform the job of office worker

(2,500); information clerk (2,200); and surveillance system monitor (1,000) (Tr. 80-81). If

the same individual (original question plus a limitation to sedentary work) required the use

of a cane for walking on uneven terrain or for long distances, the numbers would be reduced

to office clerk (1,500); reception clerk (1,800); and surveillance system monitor (900) (Tr.

81). The VE stated that if the same individual were also allowed to sit or stand while

performing the job, the job numbers would be reduced to office clerk (1,200); reception clerk (1,500); and surveillance system monitor (750) (Tr. 81).

The VE testified if the same individual were limited by the need to be "off task" for 20 percent or more of the workday; needed to be absent from work two or more days each month; or, needed to elevate his leg above heart level over the course of the workday, all gainful employment would be precluded (Tr. 81-82). In response to questioning by Plaintiff's counsel, the VE stated that the need to lie down at unpredictable intervals over the course of the workday would also preclude all work (Tr. 82-83).

### D.    The ALJ's Decision

Citing Plaintiff's treating records, ALJ Fallis found that Plaintiff experienced the severe impairments of "status post left femur fracture with residual pain, atrophy and decreased function; status post aneurysm with coiling and residual numbness and decreased function of the left upper extremity; degenerative disc disease of the cervical spine; and chronic pain" but that none of the impairments met or equaled a listed impairment under 20 CF.R. Part 404, Subpart P, Appendix 1 (Tr. 21). He found that Plaintiff retained the Residual Functional Capacity ("RFC") for sedentary work with the following additional limitations:

> He is allowed to sit or stand alternatively provided he is not off task more than 10% of the work period. He can perform occasional pushing and pulling with occasional foot control operation. He can never climb ladders, ropes or scaffolds. He can occasionally climb ramps or stairs and occasionally balance, stoop, kneel, crouch or crawl. He can perform occasional handling of objects and fingering with his non-dominant hand (left hand). The worker is limited to jobs which can be performed while using a hand held assistive device only for uneven terrain or prolonged ambulation and the contra lateral upper

> extremity can be use[d] to lift and carry up to the exertional limits.  he must
> avoid all exposure to extreme cold, excessive vibration, unprotected heights,
> and all use of hazardous moving machinery (Tr. 22).

Citing the VE's job findings, the ALJ found that while Plaintiff was unable to perform his past relevant work, he could perform the jobs of office clerk, receptionist/information clerk, and surveillance system monitor (Tr. 28).

The ALJ acknowledged that Plaintiff sustained significant injuries in the June, 2008 accident but found that the limitations did not prevent the performance of sedentary work for 12 months or longer as required for a finding of disability (Tr. 26).   The ALJ cited January, 2009 physical therapy records stating that Plaintiff's ability to perform activities of daily living had increased 50 percent (Tr. 26).  The ALJ noted that Plaintiff's testimony that he had not taken a vacation since June, 2008 was contradicted by 2009 treating records stating that he experienced a stroke in July, 2009 while on vacation (Tr. 26, 64).  He noted further that Plaintiff's denial of recent marijuana use stood at odds with treating records indicating that he smoked marijuana on an occasional basis (Tr. 26).

## STANDARD OF REVIEW

The district court reviews the final decision of the Commissioner to determine whether it is supported by substantial evidence.  42 U.S.C. §405(g); *Sherrill v. Secretary of Health and Human Services,* 757 F.2d 803, 804 (6th Cir. 1985).  Substantial evidence is more than a scintilla but less that a preponderance.  It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales,* 402 U.S.

389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (*quoting Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, S. Ct. 206, 83 L.Ed.126 (1938)). The standard of review is deferential and "presupposes that there is a 'zone of choice' within which decision makers can go either way, without interference from the courts." *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)(en banc). In determining whether the evidence is substantial, the court must "take into account whatever in the record fairly detracts from its weight." *Wages v. Secretary of Health & Human Services*, 755 F.2d 495, 497 (6th Cir. 1985). The court must examine the administrative record as a whole, and may look to any evidence in the record, regardless of whether it has been cited by the ALJ. *Walker v. Secretary of Health and Human Services*, 884 F.2d 241, 245 (6th Cir. 1989).

## FRAMEWORK FOR DISABILITY DETERMINATIONS

Disability is defined in the Social Security Act as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). In evaluating whether a claimant is disabled, the Commissioner is to consider, in sequence, whether the claimant: 1) worked during the alleged period of disability; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of an impairment listed in the regulations; 4) can return to past relevant work; and 5) if not, whether he or she can perform other work in the national economy. 20 C.F.R. §416.920(a). The Plaintiff has

the burden of proof at steps one through four, but the burden shifts to the Commissioner at step five to demonstrate that, "notwithstanding the claimant's impairment, he retains the residual functional capacity to perform specific jobs existing in the national economy." *Richardson v. Secretary of Health & Human Services,* 735 F.2d 962, 964 (6th Cir.1984).

## ANALYSIS

### A.  The Treating Physician Analysis

Plaintiff argues first that the ALJ partial rejection of Dr. Benson's July, 2012 findings was both procedurally and substantively flawed. *Plaintiff's Brief,* 7-11, *Docket #9.* Plaintiff contends that the ALJ erred by failing to consider the length and nature of the treating relationship and its consistency with the record as a whole as required by 20 C.F.R. § 1527(c). *Id.* He contends that while the ALJ stated that he considered all of the relevant evidence in declining to give controlling weight to Dr. Benson's opinion, he failed to provide "specific[] reasons as to how he arrived at [his] conclusion." *Id.* at 9.

An uncontradicted, well supported treating source opinion "must be given controlling weight." *Hensley v. Astrue,* 573 F.3d 263, 266 (6th Cir.2009) (citing *Wilson v. Commissioner of Social Sec.,* 378 F.3d 541, 544 (6th Cir.2004)(internal quotation marks omitted)); *Cole v. Commissioner of Social Security,* 661 F.3d 931, 937 (6th Cir. 2011).  Further,

> [i]f the opinion of a treating source is not accorded controlling weight, an ALJ must apply certain factors--namely, the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source--in determining what weight to give the opinion. *Wilson,* at 544; § 1527(c).

-13-

The ALJ stated that he accorded "partial weight" to the July, 2012 assessment because it was inconsistent with Dr. Benson's own records and the transcript as a whole (Tr. 27). The partial rejection of Dr. Benson's opinion concludes the ALJ's lengthy discussion of the objective studies, physical therapy records, and Dr. Benson's own records (Tr. 25-27). So far, so good. However, the treating physician analysis founders on erroneous findings and mis-characterizations of the record. The ALJ cited November, 2009 treating notes stating that that Plaintiff was able to "walk normally" as of November, 2009 (Tr. 26). Although the November records state that he was able to walk without an assistive device, the ability to walk without "gait deviations" was referred to as a *future* goal (Tr. 541). Plaintiff was actually observed walking with "decreased step length" on the left (Tr. 542). While the ALJ noted correctly that the November, 2009 records state that Plaintiff experienced only level "3" pain, the therapy records also state that he continued to require prescription strength pain medication and that further, that he experienced a significant regression in January, 2010 (Tr. 535-536, 543). Therapy notes from January, 2010 state that Plaintiff continued to exhibit gait abnormalities (Tr. 546).

The ALJ discredits Dr. Benson's July, 2012 statement that Plaintiff experienced occasional edema by noting that the treating records from the same month did not mention of edema (Tr. 27). However, therapy records from 2009 state that Plaintiff experienced left leg edema as a result of the left leg trauma (Tr. 25, 514). The ALJ cites Dr. Benson's "July, 2012" observation of "'sudden onset' of pain" to support the conclusion that Plaintiff was

-14-

doing well until a July, 2012 relapse (Tr. 27, 503).  Contrary to the  conclusion that Plaintiff

experienced a sudden downturn in July, 2012 after a long period of good health,  March,

2012 treating records by Dr. Benson also state that Plaintiff had a "sudden onset of constant

episodes" of hip pain beginning in 2008 (Tr. 476). Plaintiff's multiple complaints of "sudden

onset" pain are more reasonably interpreted to state that he experienced a "sudden onset" of

hip pain (resulting in continuous pain) starting with June, 2008 accident.

The ALJ discredits Dr. Benson's finding that Plaintiff was unable to work sit, stand,

or walk for a total of eight hours in an eight-hour workday because Dr. Benson's treating

notes show "few positive findings" (Tr. 27).  However, Dr. Benson's June, 2011 notes show

knee problems, left arm weakness, and facial numbness (Tr. 469).  Dr. Benson's November,

2011 records showing "traumatic arthritis" of the hip and knee are consistent with 2008 and

2012 MRIs showing degenerative arthritis as a result of the 2008 accident (Tr. 586-587).

While Dr. Benson's treating notes do not make reference to the side effects of drowsiness

as a result of narcotic use, his July, 2012 statement that the narcotic medication (Vicodin)

would be expected to create the side effect of drowsiness is undisputed (Tr. 498).  The ALJ's

distorted and in some instances erroneous interpretation of the medical evidence does not

amount to "good reasons" for rejecting Dr. Benson's opinion.  As such, a remand is

warranted.

### B.  The Credibility Determination

Plaintiff also argues that the ALJ erred by placing exaggerated emphasis on his

occasional use of marijuana and his ability to leave town in July, 2009. *Plaintiff's Brief* at 11-13. Plaintiff faults the ALJ for discussing "the few notes of improvement in [the] health conditions" while failing to mention the numerous records showing that Plaintiff's condition plateaued or worsened between June, 2008 and July, 2012. *Id.*

The credibility determination, guided by SSR 96-7p, describes the required two-step process for evaluating symptoms. "First, the adjudicator must consider whether there is an underlying medically determinable physical or mental impairment. . .that can be shown by medically acceptable clinical and laboratory diagnostic techniques." *Id.,*1996 WL 374186 at *2. The second prong of SSR 96-7p directs that whenever a claimant's allegations regarding "the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence," the testimony must be evaluated "based on a consideration of the entire case record."*Id.* [1]

"[A]n ALJ's credibility determinations about the claimant are to be given great weight,

---

[1]In addition to an analysis of the medical evidence, C.F.R. 404.1529(c)(3) lists the factors to be considered in making a credibility determination:

 (i) Your daily activities; (ii) The location, duration, frequency, and intensity of your pain or other symptoms; (iii) Precipitating and aggravating factors; (iv) The type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms; (v) treatment, other than medication, you receive or have received for relief of your pain or other symptoms; (vi) Any measures you use or have used to relieve your pain or other symptoms ... and (vii) Other factors concerning your functional limitations and restrictions due to pain or other symptoms."

'particularly since the ALJ is charged with observing the claimant's demeanor and credibility.' " *Cruse v. Commissioner of Social Sec*., 502 F.3d 532, 542 (6th Cir.2007) (citing *Walters v. Commissioner of Social Sec.,* 127 F.3d 525, 531 (6th Cir.1997)); See also *Casey v. Secretary of Health and Human Services,* 987 F.2d 1230, 1234 (6th Cir.1993); *Anderson v. Bowen*, 868 F.2d 921, 927 (7th Cir.1989) (citing *Imani v. Heckler*, 797 F.2d 508, 512 (7th Cir.1986))(An ALJ's "credibility determination must stand unless 'patently wrong in view of the cold record'").

The ALJ's erroneous findings, as discussed above, also taint the credibility determination.  While under the deferential substantial evidence standard, an ALJ need not support his findings with preponderance of the evidence, *Mullen, supra,* 800 F.2d at 545, "cherry picking" or disregarding favorable statements from a record that, as a whole, demonstrates disability as a result of the injuries from the June, 2008 motorcycle accident, amounts to a distortion of the record. "'Substantial evidence' can only be considered as supporting evidence in relationship to all the other evidence in the record" *Laskowski v. Apfel,* 100 F.Supp.2d 474, 482 (E.D.Mich.2000) (Roberts, J.)(citing *Cotter v. Harris*, 642 F.2d 700, 706 (3rd Cir.1981). "Substantial evidence cannot be based on fragments of the record." *Laskowski,* at 482.

Standing alone, the ALJ's finding that Plaintiff was not disabled for the 12-month period between June, 2008 and June, 2009 (the minimum period of disability required for an award of benefits under 42 U.S.C. §423(d)(1)(A)) is clearly erroneous, given that the medical

-17-

records for every month of this period show disability level restrictions.  None of the records from this period suggest that Plaintiff was capable of standing or walking for a total of two hours in an eight-hour workday as stating in the RFC (Tr. 22).  July, 2008 records state that Plaintiff was wheelchair bound (Tr. 226).  As of October, 2008, he was still required to use crutches and taking only small steps with the left leg  (Tr. 506).  December, 2008 therapy notes state that he experienced slow improvement, but continued to experience level "8" pain and ongoing seepage from the left leg wound (Tr. 514).  February, 2009 notes state that he continued to make improvement but experienced up to level "5" pain (Tr. 520).  April, 2009 notes allow that Plaintiff had been walking for "greater distances," but none of the sessions up to May, 2009 state that Plaintiff was able to walk with a normal gait or experienced more than a 60 percent improvement in activities of daily living (Tr. 520).   None of the records from this period could be interpreted to state that Plaintiff was capable of walking or standing for two hours in an eight-hour workday as stated in the RFC (Tr. 22).  Plaintiff experienced an aneurysm on May 5, 2009 (four days after being discharged from therapy) (Tr. 324, 529).  Following an immediate catheterization, Plaintiff underwent surgery for the implantation of a stent on June 12, 2009 (Tr. 396-397).   It is beyond dispute that Plaintiff was unable to work between the May 5, 2009 diagnosis of the aneurysm, the June, 2009 stent implantation, and the July, 2009 stroke.  Without considering the period of time Plaintiff required to recover after the July, 2009 stroke or the ongoing residual effects on his accident-related conditions from August, 2009 forward, the record overwhelmingly shows that Plaintiff was

-18-

unable to perform even a restricted range of sedentary work for a period of at least 12 months.

The ALJ notes that Plaintiff's testimony that he had not taken a vacation since June, 2008 stood at odds with July, 2009 medical records stating that he experienced a stroke while on vacation (Tr. 64, 26-27, 385).   However, as noted by Plaintiff, it is unclear  what level of activity he engaged in on the "vacation" and how long he had been away before the vacation (by car/trailer) was aborted by the stroke (Tr. 385).   *Plaintiff's Brief* at 12-13.  It is unclear who drove or whether Plaintiff spent his time reclining in the back of his trailer (Tr. 385, 415).   His testimony that he had not vacationed since 2008 is not innately inconsistent with the July, 2009 medical records referencing the aborted motor trip.  The ALJ also noted that Plaintiff testimony denying drug use stood at odds with his statement to Dr. Benson that he used marijuana on an occasional basis (Tr. 27).  Plaintiff's testimony denying current marijuana use, while of concern, is not entitled to greater weight than the numerous objective studies and therapy and treating records showing long-term disability level limitations.

## C.  A Remand

The above discussed issues provide grounds for remand.   The final question is whether to remand for further fact-finding or an award of benefits.  The Sixth Circuit has held that it is appropriate to remand for an award of benefits when "all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to

benefits." *Faucher v. Secretary of Health and Human Services*, 17 F.3d 171 (6th Cir. 1994). This transcript overwhelmingly supports the conclusion that Plaintiff was disabled for at least a 12-month period starting June 3, 2008. Because the record establishes overwhelmingly that Plaintiff was disabled between June 3, 2008 and July 31, 2009, he is entitled to benefits for this period.

In contrast, Plaintiff has established a strong but not overwhelming case for benefits between August 1, 2009 and forward. However, a remand for further fact-finding is appropriate for reconsideration of the evidence relating to the period after July 31, 2009 due to the ALJ's selective and erroneous reliance on certain portions of the record and the exclusion of others. For instance, while the ALJ acknowledged a 2012 EMG showing right-side Carpal Tunnel Syndrome ("CTS"), the RFC contains no limitation on the use of the right hand (Tr. 22, 26, 589-590). The ALJ rationalized the omission of CTS from the severe impairments at Step Two and the RFC by noting that "there is no indication" that the CTS would "last the needed 12 months to be considered a severe impairment" (Tr. 26). However, at the hearing, Plaintiff reported long term manipulative limitations of the right hand (Tr. 59). While Plaintiff attributed the right hand problems to arthritis rather than CTS, there is no indication that the right hand limitations simply popped up on the day of the July, 2012 EMG. At a minimum, the EMG confirms Plaintiff's claim of right-side limitations. Moreover, the ALJ's accompanying statement that the condition of CTS "should be correctable with surgery" is wholly unsupported by the treating notes or objective studies (Tr. 26). As such,

I recommend a remand for further fact-finding for this period consistent with these findings for determination of whether the disability continued beyond August 1, 2009.

## CONCLUSION

For the reasons stated above, I recommend  that Defendant's Motion for Summary Judgment be DENIED and that Plaintiff's Motion for Summary Judgment GRANTED, remanding this case for an award of benefits for the period between June 3, 2008 and July 31, 2009 and remanding for further fact-finding and determination of whether Plaintiff is entitled to benefits from August 1, 2009 and forward.

Any objections to this  Report and Recommendation must be filed  within 14 days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and E.D. Mich. LR 72.1(d)(2). Issue first raised in objections to a magistrate judge's report and recommendation are deemed waived. *U.S. v. Waters,* 158 F.3d 933, 936 (6th Cir. 1998). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Howard v. Secretary of HHS,* 932 F.2d 505 (6th Cir. 1991); *United States v. Walters,* 638 F.2d 947 (6th Cir.  1981).  Filing of objections which raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation.  *Willis v. Secretary of HHS,* 931 F.2d 390, 401 (6th Cir.  1991); *Smith v. Detroit Fed'n of Teachers Local 231,* 829 F.2d 1370, 1373 (6th Cir.  1987).  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

-21-

Within 14 days of service of any objecting party's timely filed objections, the opposing party may file a response.  The response shall be not more than 20 pages in length unless by motion and order such page limit is extended by the court.  The response shall address specifically, and in the same order raised, each issue contained within the objections.


s/R. Steven Whalen
R. STEVEN WHALEN
UNITED STATES MAGISTRATE JUDGE

Dated: February 9, 2015

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was sent to parties of record on February 9, 2015, electronically and/or by U.S. mail.

s/Carolyn M. Ciesla
Case Manager